May it please the Court, Michael Kennedy, Chad Harwood's lawyer, first assistant with the Federal Public Defender's Office in Las Vegas in Reno. The primary issue that I want to focus on first is it's the most egregious error. We presented an instruction for the Court to give, which was a theory of the defense instruction. In this case, in the first trial, in the excerpt of records, we personally told the judge this was our theory of the defense. Questions came out in the first trial on the meaning of control, which was precisely the  The instruction was also based on the fact that the Supreme Court had rejected it after the Court had written out. That instruction was based on three cases from this Court, Behema, Rodriguez and Soto, which were very close factually and went to what is possession, what is not possession, and the meaning of the word control within the standard possession instruction. Kennedy, the difficulties as a practical matter, as I have with the proposal, assuming the instruction was correct, which I actually have some significant doubt about, but assuming that your proposed instruction was a correct formulation of the law, there are lots of things that possession is not. There are lots of things that everything is not. The real question for a district court, it seems to me, in instructing the jury, is what the law is, not what it is not. And so without any question, the jury was correctly instructed on what possession is. Can you explain to me why we should hold, perhaps for the first time ever, that it was improper not to give an instruction about what something is not? Yes. Oftentimes it's difficult to define terms as to what they are. In a particular case, it's oftentimes difficult to define what justice is. So I've heard what an injustice is to define what justice is. In this case, after giving the possession instruction, the first jury came back and struggled with the meaning of control. The word control was then the subject of the further definition within 318, because the jury struggled with that and hung on it during the first trial. We went directly to this Court's cases to show what is not control, to give that instruction. In the second trial, we had not only problems in terms of questions, but there were three specific questions that went to possession. First question, do you have to own something to register it, which went directly to 4, 5, and 6. Second question, about is there a period of time. Well, I'm sure the judge did not preclude you from arguing. Yes. Well, but the argument, as the Escobar-DeBrite case said, merely allowing argument without the instruction that if it is believed, would allow an acquittal, is per se unreasonable. If there isn't anything in the instructions to say that if these, it is okay for these facts. And we had foundation in the evidence. First, actual association with somebody who had actual possession of the firearm. Cheryl Main testified that Rick Main did, so we had that fact. Second, we had simply mere proximity in the vehicle. Well, yeah, and you had your client saying, yeah, they're my guns. Well, we had more than that. I mean, I don't even understand why we have to worry about this, frankly. I mean, he says they're mine. Well. I got them, they're mine. So what's the possession issue even? I don't even. Possession issue was that much of what he said was explained at trial. Well, maybe, but he said it, so that suffices to show that he did have possession of the guns, because he said they were his. Well, obviously, if that was true, by the first jury, you would not have had a question about what control meant. Not so, you had no idea what. They were obviously struggling. I mean, one juror can have a question about anything. Well, in that case. Just explain to me why we even have to worry about it when he says, these are my guns. Sure, I mean, because we cited a case which comes from the Ninth Circuit which says that the mere existence of a confession or a statement that is so interpreted doesn't end the trial process. In this case, we explained that many of these witnesses were in fear of the actual possessor of the guns, Rick Main. That one witness actually came and testified that he had told ATF one thing, that he had told them to chat arm with, because he felt fear of reprisal. This is an individual who has an armament. And all of the weapons were traced to Rick Main, this individual. And so what we're talking about is one day in the life of Chad Harwood. It was clear that the evidence showed that up until August 18th of that year, that these firearms were all traced to Rick Main. He flew in, he drove up there. So what we're talking about is just the events of one day. That's where the first confession was, I brought them on the plane. No one believed that. The second statement was, I found them at a rest stop between Sacramento and Reno. Nobody believed that. So the jury looked at it and said this was all garbage. Even the ATF agent said he didn't believe Mr. Harwood. So what it came down to then is the jury quite rightly saw these are Rick Main's guns, we're talking about one day, we're talking about a rental vehicle, we're talking about guns found in the vehicle, the garment conceded that Chad Harwood did not have actual possession, a witness testified that Rick Main had actual possession, so what you're talking about then is mere proximity and mere association in a case that there was no other instruction that gave those elements of the law. Sometimes in cases when there's an aiding and abetting instruction, 5.1, those areas are otherwise covered. In this case they were not. So there was foundation in the evidence, it was a correct statement of the law, and it was the theory of defense. At 1284 A and B, I submitted two draft instructions for the court. We're not claiming that we needed any particular language. We submitted two options for the court to give. But if there's foundation in the evidence and it's a correct statement of the law, it is reversible error to fail to give that instruction. This was then compounded, because all of this flows back to Rick Main, to the second instruction issue, which was the missing witness instruction, which, one, I put Rick Main up on the stand outside the presence of the jury, asked him every conceivable question that could come out, and he took the fifth. During trial, during the second trial, we had two questions that came, where is Rick Main? The first time that question came out was when Chad Harwood was testifying. The second time it came out was right after we completed our closing argument. After the first question, I requested the missing witness instruction. After the second question, I requested it again. It's not proper in every case. But in this case, what the court failed to do was, one, instruct it all, two, give a missing witness instruction, or three, allow proper argument. In this court's case, I believe it's Judge Kaczynski's case, I think it's Koyoyan, I'm probably pronouncing it incorrectly, but 8th Fed 3rd, I asked the judge, can I tell this jury that I am powerless to bring this man to court? He said no. That's exactly what was permitted in that case. At that point, we had merely form over substance. You could subpoena him. But at that point, he had exhausted all of his Fifth Amendment privilege under oath in front of the judge. The district court found that he was unavailable. So once again, the timing of the questions showed that the jury expected us to bring him. The government itself did not have him under subpoena and had the ability. In the Koyoyan case, if I remember the argument, it was, he has chosen not to testify. The government has the power to bring him here. I do not. And the court said that was proper argument. That is what was in the context of two questions. Here the difference is, of course, that neither side, he was unavailable to both sides. And our law is very clear that in those circumstances, a missing jury instruction is inappropriate. That's Bretzman. But Bretzman is further, the follow-up case being Koyoyan, that was the case. Which is, he was available for the government to give immunity. And so that was the argument in that case. The argument that was found upheld by this court was that the government has the power to bring him as a witness. Because they alone have the right to use that power. I am powerless to bring him here. And I did, I made an argument in closing argument that went as close to that line as I could. Then the question followed up. So there was obviously a question in the jury's mind. I believe the argument that was given was that every citizen has the right to not speak. Or to be pulled into court or something along that line under direct, because we had already had one question. So the combination of those instruction issues require reversal in this case. Following that, there were five items of argument by the government. One, a representation that the government counsel had knowledge that David Booth had spoken to Rick Main about a follow-up subsequent sale. Which was there. A misrepresentation of $2,500 for guns. A misrepresentation following up that look at who they subpoenaed and who they could have subpoenaed. When in court, Rick Main took the fifth. So there was follow-up on those questions that were essential. Because we have one jury that hung on the issue of control. Can I ask you a question on that? I didn't see the entire thing around it. Was there any objection to closing argument? Yes. To those five points? I'm sorry? To the five points that you've mentioned? Yes. There were two objections. The first objection was to the comment about the $2,500 for guns. Okay. The court overruled that objection and said it was improper for me to make it. The second one was when there was comment about a subsequent sale. David Booth talked to Rick Main and there was a subsequent sale. So there were objections to those two. Yes. Not to the others. I don't believe there were. I believe those were the two, Your Honor. Thank you. So there were two and then there were the other three comments. Thank you. To reserve three minutes for rebuttal, I filed with the court a 28-J letter on the Stuart case that just came down. Directly on 922-0, what counts 1, 2, and 3 of conviction, that is directly on point. All of the testimony showed that these were homemade firearms. May I ask you a question on Stuart? Sure. In Stuart, what the defendant had acquired was a kit with a bunch of parts, which he then assembled into a gun. Yes. Here, there was actually a gun that traveled in interstate commerce, but there were some modifications made and nobody is entirely clear in the record, I guess, where or who made those modifications. But there was a gun, a weapon that traveled in interstate commerce. Would you tell me why you don't think that distinguishes Stuart? Well, I don't believe it distinguishes Stuart on the several bases. First, the kits in Stuart were the basis of the search warrant. Then no criminal charges followed from those kits. What they found were a number of firearms, including some machine guns. So there wasn't any testimony that they had been made from kits. In our case, in the Stuart case, the kits were the way that they got the search warrant in the beginning. And there was evidence from Mr. Stuart that he himself had made the alterations with various parts. And there was no dispute that some of those parts had traveled in interstate commerce and some of those firearms had parts... It was all put together in California, wherever it was. No machine gun in total did, but the firearms, I believe, could have. I don't know that they pinned that down. But to answer the question... Well, I think it is discreminated on the fact that... It's quite clear. ...that it was put together. The machine gun was... It was brought together to make a machine gun? But the machine gun was put together, and so you're altering. Like in our case, Exhibits 2 and 3 were parts. Those were parts that were sent unassembled in the Harwood case. Dave Schill picked them up on August 9th at a gun shop in parts. He then testified at the trial that he sold them to Rick May. You know what? As I read it, it says Stuart did not acquire his machine guns. He fabricated them himself. Sure. I mean, he made the gun. And in our case, he made the gun... Modified it. Modified it, yes. He modified the gun. Right. And in our case, what the evidence would show is that Dave Schill got these parts. They were in parts on August 9th. He testified that he sold them to Rick May, either the next day or the day after. They were found on the 19th, put together as a machine gun. Those were Exhibits 2 and... Did you argue this? We did not... Did you make any argument that this was not... That no gun had ever... We only challenged it on a Rule 29 basis in terms of both the first trial, the second trial, at each step of the way. It is jurisdictional. And with respect to the 920... With respect to the Counts 4, 5, and 6, I went back and looked at the jury instructions. I believe they're at 1185, 1186. The 922-0 instructions were lesser-included of the 26 U.S.C. 5861s in that the first two elements of each instruction were the same. The only different element is the firearm was not registered. The only reason that a firearm needs to be registered under 2861 is that it's defined to be a firearm which is a machine gun. So it's the mere possession of the machine gun which is the crime under 5861 as well. Mr. Kennedy, what do you think we ought to do about Stewart? I mean, the Stewart issue. The Stewart issue, we would have to remand to the District Court for an evidentiary hearing on the jurisdictional question for all of these counts. To the District Court? Or is that a jury issue? Well, there would have to be factual findings made. If the record isn't made... Well, the record is made. It's just that the court would have to look at the record and see if there were facts that would put it into one of the three areas. I don't believe there are. This court can make those findings if it does, but I think usually what it is is a remand to the District Court to consider. And then, if there are any issues, we would come up again. I think that would be the more prudent. Thank you. Thank you. Good morning. My name is Robert Don Gifford. I'm an Assistant United States Attorney from the District of Nevada. May it please the Court, Counsel. What do you think we should do about Stewart? Stewart... Stewart troubles me in that there is no element of the offense that requires that there be any interstate nexus. And I know that when Judge Kaczynski reached his opinion, he relied on an earlier Ninth Circuit decision that reached in and found the Commerce Clause available. I think Judge Kaczynski used as support in that case another case dealing with the Second Amendment talking about how an individual doesn't have the right to have a firearm. He had help, so you might as well speak of it as the panel. Yes, Your Honor. But in the opinion, he cited to a case that he had a strong dissent to. And I believe that there is some underpinnings that he would like to see that case dealing with the Second Amendment overturned before this case. I think that since it is not an element of the offense, I think Congress does have a very good concern to know about where machine guns are located. Who owns them? I think these are the type of weapons that are inherently dangerous. I don't think that since it has been tried and true that we have never asked a jury or a judge to find that an interstate nexus is necessary to find someone guilty of this offense. I do not think Stewart... Okay, I'm still not very clear on what you think we ought to do about it. We're sitting here and we've got Stewart on the books. Whether it is correct or incorrect, it's on the books at the moment. At this time, I will... What do you think we should do with it? Do you think we should distinguish it? Do you think we should wait for it or what do you think we should do? I mean, Mr. Kennedy suggests that we remand to the district court for some kind of evidentiary hearing or he says we can look at the record ourselves. But I mean, the real question is can we distinguish it? Should we apply it and follow it without distinction and dismiss this whole indictment or what? In this case, personally, I don't like the Stewart decision. However, I don't think it applies to this case simply because we don't know the true story here. Because we have two confessions and we have no idea what a jury talked about and we don't have what story they decided to believe. Mr. Harwood...  You're speaking for the United States government? Yes, ma'am. Well, let me be more specific about that question. I mean, have you actually asked the Attorney General or the Solicitor General what position the United States should take in this court on Stewart? My understanding is that the U.S. Attorney's Office in Arizona was going to be seeking reconsideration on that case, that they had filed for a motion... Then I assume that your position would be that we should just sit tight for it. Yes, yes. But as far as applying it to Mr. Harwood, in one of his confessions said that he got these machine guns in Oregon. He brought these from Oregon. I think if there's any question, if you want to try to... Were they machine guns when they came from Oregon? In one of his confessions, he stated that he got these machine guns from Oregon and brought them to... I thought we were dealing with a modified non-machine gun. He had a gun that he modified. Isn't that what this case is about? It's involved with that as well. Are there other guns involved in this case? I'm sorry, ma'am? I didn't realize there were other guns involved. I thought we were talking about a gun that was not a machine gun that was modified. There are three machine guns. Two of the three that we know of were at one point regular firearms. They were modified into machine guns. As far as what it takes to modify a weapon into a machine gun, then we start getting into a question of do we distinguish between modify versus make from separate parts to create? Does that make a machine gun? What makes a machine gun homemade? Does it have to come from a legal company as a machine gun before we can charge it? Before the gun was modified, was it illegal to hold it? We have a legal gun, right? Yes, ma'am. Okay. Then it's modified. At the point it's modified, the presumption has been in interstate commerce and it's illegal. I'm not quite sure. There's nothing in the record that indicates where the weapons came from. My understanding is that there are no fire manufacturers in the state of Nevada at this time. But since interstate commerce is not showing an interstate nexus... There's actually testimony in the record about where the guns came from. I mean, one of them came from... I mean, I can find it. I've got it. They came from out of state. But that's sort of neither here nor there if the issue is whether they have to have come in as a machine gun. The... I mean, there's testimony in the record. One of them came from Lewis Machine and Tool of Macon, Illinois, and the other one came from some other out-of-state manufacturer. But if Stewart says that doesn't matter, then it doesn't matter. Right. I think my reading of Stewart, that was a gun in Stewart that was created from multiple pieces, from scratch. Yes, ma'am. There was never a legal weapon. But in Stewart, it says, some components of Stewart's machine guns had crossed state lines, but these components did not add up to a gun, not even close. These did add up to a gun. They did. Would that be a basis of distinguishing Stewart? Yes, ma'am. That could be a basis. Now, one thing that the government cannot show and has not ever been required to show is that when it crossed state lines, was it already a machine gun? In this case, we really don't know exactly where it was modified at. I think that you can make an argument or we could speculate and guess, but we have really no idea. But we know at one point it was a firearm and it was... If we don't know, at least my next question, the fact that it was modified, at the point it was modified, does that just make the whole thing illegal and a presumption that it was in interstate commerce then? I don't think the modification itself makes it interstate commerce. Where the modification took place is my question. If the modification takes place in Utah, at that point, the guns had been sent in from some other place, is that what makes it illegal? Do you have to prove that it was modified at a particular place to make it illegal or do you just presume that once it's a machine gun, it's illegal? The latter, Your Honor. As soon as it's a machine gun, it is illegal. Whether or not... If it's modified in Nevada, where the court heard this, or in Utah or in Oregon, it doesn't really matter. Counsel, let me go back to my problem. As the counsel for the United States, and I have represented the United States myself, you have a certain obligation to assist the court in determining what we should do and what the interests of the United States are in the matter. Now, I'm having a little trouble understanding what you want us to do with this Stewart case, whether you wish us to wait until it's final, whether you wish us to distinguish it, whether or not you have consulted, whether or not you would like to have additional time since it has not been briefed, to have supplemental briefs. Give us a little guidance here as to what you think we should do. Well, my initial response is that Stewart is inapplicable to this case, simply because we know that... What was at issue with it, Stewart, was a homemade machine gun? Distinguish it on its facts. Distinguish the two cases on its facts? In this case, this... No, no, that's your position? Oh, yes, yes. Secondly, if Stewart is pivotal in this case, which I don't believe it is, that I think it's... I would ask for further briefing, especially since I think that there's... I guess the government does have an interest in this case and it will be changing... I guess there will be further briefing on the issue and the government would like to take advantage of that opportunity. Okay. Just in response to Mr. Kennedy, he said that he only wanted to tell the jury that he was powerless to bring Rick Mayne to the court. I would disagree with that. He wanted to tell the jury that Rick Mayne took the Fifth Amendment in a previous trial. That's not evidence, and that's something that's not proper for a jury to hear. Secondly, we don't know if he was powerless because Rick Mayne was never subpoenaed for the second trial. He had a defense investigator interview him, and that would be one of the first things, is that... I believe that it was the Bramble case. It came down to three issues. The defense investigator interviewed him. So he either knew what he had to say was helpful to his client Harwood, not helpful to him at all, or it didn't really matter either way. In the Bramble case, we know what was said. In fact, the defense and the briefs have said that they were only going to call Rick Mayne to testify consistently with what he had previously told ATF. The only thing that he ever told ATF was, one, he sold those weapons, and he didn't remember who he sold them to, and number two, he didn't know who Chad Harwood was. That's not helpful to the defendant. And so he has no right to make a missing witness instruction. As far as the evidence that they've shown, the evidence that he's relying on are coming from defense witnesses who each and every single one of them were in peace for one reason or another. A jury is free to believe certain things or free to believe nothing a witness says. They can believe things in piecemeal. What a jury decided back in a deliberation room is for only a jury's decision. In this case, we have an individual who made not one but two different confessions. The firearms were found in his vehicle. He even signed a receipt claiming them. The court bent over backwards in showing that he knew that they were machine guns. The agents they interviewed him were very careful about that as well. They went to that extra length to make sure that he used the word machine gun and not the government. May I just ask you a question on the closing argument? Did you make the closing argument? Yes, ma'am. Well, how was it permissible inference to state in closing that Mr. Harwood took four bikes from Maine's house to satisfy a debt when Mrs. Maine had testified that the bikes were Harwood's all along? Well, see, that came from cross-examination. When I cross-examined her, in fact, I even asked her further down the transcript, I pinned her down on the conversation I had with her and she confirmed that her and I had spoke prior to trial and she confirmed that, number one, that he had come down to get those motorcycles for some unknown debt. And that was what was at issue. Now, she also stated that she did not know the business because she knew that Chad Harwood and her ex-husband were in a business. And she said she knew nothing about that business. So the only thing that she was relying on was what the defendant Chad Harwood had told her. Yeah, those are my bikes. She thought out that they were his bikes. And yet that was used in closing argument. Well, it was used to satisfy a debt, an unknown debt, which she didn't know what that debt was for. Well, you stated in closing that Harwood took four bikes to satisfy the debt when she had testified they were his bikes. There were several things in closing argument I found very bothersome. For instance, the state in closing that Harwood gave Maine $2,500 to buy guns. See, I think it's a reasonable inference that if he comes down to take these bikes, he says they're his bikes to satisfy a debt that he owed. In fact, I even say that here's a possible theory. And I even tell the jury that I don't even know, we don't know what all the details are. But based on everything that you've heard today, here's a reasonable assumption. We know that Chad Harwood came down there to pick up four motorcycles to satisfy a debt of $2,500 for some unknown debt. And Chad Harwood, I think he even confirmed that as well. Now, we don't know what that debt is for. Now, we know that he was out there shooting machine guns. We had no idea if he was going to buy machine guns, if he was just out playing with them, if they were his and he brought them with him down from Oregon. We don't know any of that. But all of that was statements and evidence that came from the witness stand. And putting the pieces together, I'm thinking, okay, here's a guy who comes down, because Rick May knows him, $2,500 for what? I don't know. Maybe it's for these machine guns. Maybe he was going to buy one of these machine guns when the, and this was my argument. He wanted to buy one of these machine guns. The Douglas County Sheriff's Department came and confiscated these machine guns. He's out $2,500. What about the bikes? The bikes? I mean, there was specific evidence that they were his bikes. And yet you use that in closing argument. You don't need to spend more time on it. I just want you to know, I found it very bothersome the way these facts were presented in closing argument. I suppose what your position is is that it's a reasonable inference from the facts and the record. Yes. It may not be correct, but it's a reasonable inference. I have no idea. I mean, the fact is is that he went to Rick May's house, who Rick May was no longer living there, went there and took four bikes off of his property. And he's saying, well, the reason I'm taking them is because they're mine. Well, you know, that's his position. All right. I understand your position. Thanks. Yes, ma'am. I don't know. I think I've covered all the points I wanted to cover. If there's any questions, I'll be glad to answer any questions. Thank you. Thank you very much. Let me pin down the reason that Stewart is not distinguishable. At 16067, the first headnote of the unpublished opinion, the court says, we therefore cannot say that the machine guns themselves in any recognizable form traveled in interstate commerce. Here are the exhibits we have in Horowitz's case. Exhibit number one, that was purchased as an AR-15 by Rick May, traced by ATF agent Booth, as an AR-15. It was modified to be 50 caliber. The difference between an AR-15 and a 50 caliber machine gun cannot be required by a simple turn of a screwdriver or a bit of a hammer. With respect to exhibits two and three, those were sold to a local gun shop in Minden, Nevada as parts. Those parts could be put together to be a firearm, a legal firearm, that Dave Schilt could have put together. He sold those parts to Rick May. His testimony was he received them on August 9th. He then sold them on the 10th or the 11th of August, and the date in question was August 19th. The evidence was that Chad Harwood was in Portland, Oregon at home during that entire time period. If you simply took and assembled those parts, you would have a legal firearm, but they were modified to be machine guns, which required unique firearms and ATF agent Howard, I believe is his last name, who has about 30 years in work, had to actually take exhibit number three, put a different bolt part on it to make it work because there was a could not fire in its present condition and there was some cross-examination of it. Buy a fully automatic machine gun like this? Yes. I thought that there had to be some modification to it. No, you can buy them. They are restricted as to who can own them, where they travel to. There's a registration process that I believe the Court's opinion and Stuart mentioned, as I think it's 18 U.S.C. 923. So there are channels of commerce where machine guns were purchased and I believe it's the Rambo case if I'm correct, is that type of case. So when the Court was using homemade on the facts, these are as and the evidence is clear to that point. Government counsel indicated that we're not certain where these weapons were. We are dead certain where those weapons were because the government's own witnesses in ATF agent Booth and Howe testified to that and Dave Schilt testified to that and I believe one of the defense exhibits in the 500 series, because Judge Hicks starts at 500, shows the receipt of the gun parts for exhibits two and three coming from the Minden store but those parts alone don't make a machine gun. These were homemade parts that Rick May now is charged with having numerous of these under the new trial motion with the videotape of him shooting machine guns, which could very well be these if I ever got a chance to look at the video. Thank you. We'll hear the next case for argument which is United States v. Delacruz.
judges: Schroeder, D.W. Nelson, Rymer